# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-03070-01-CR-S-BP |
| | ) | |
| JEFFERY A. WINDER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is the Motion to Suppress Evidence by Defendant Jeffery A. Winder. (Doc. 17.) Pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1, this action was referred to the undersigned for preliminary review. Defendant moves to suppress

> all physical evidence, whether tangible or intangible; any statements or admissions of Defendant; any and all observations of law enforcement officers and any other tangible or intangible evidence obtained during, or directly or indirectly derived from, the searches of his person and/or a motel room located at Hood's Service Center Hotel, 1651 S. State Highway K, Room 209, Bois D' Arc, Missouri and/or a vehicle described as a 2006 black Chrysler Crossfire, VIN 1C3AN59L26X066344 bearing Missouri registration EC2-B9B in which Defendant had a reasonable expectation of privacy on or about March 1, 2021.

(Doc. 17.) On September 20, 2021, the undersigned held an evidentiary hearing. (Doc. 23.) Defendant appeared in person with his attorney, Daniel E. Hunt, and the Government was represented by Josephine L. Stockard. At the hearing, the Court heard testimony from Gary McCullough, the property manager at Hood's Service Center Hotel in Bois D'Arc, Missouri, Toby Smith, a patrol supervisor with the Greene County Sheriff's Office (GCSO), Kelsey Whitcomb, a patrol officer and K-9 handler with the GCSO, Jordan Dibben, a detective and FBI task force officer in the narcotics unit with the GCSO at the time of the events at issue, and Stacy Harcombe,

an employee at Hood's Service Center Hotel.  (Doc. 25 at 4-5, 45, 65-66, 76, 94.)  For the reasons below, it is **RECOMMENDED** that Defendant's Motion to Suppress be **DENIED**.

## I. Findings of Fact[1]

Around 1:30 a.m. on Monday, March 1, 2021, a female named Nikki called Hood's Service Center Hotel, located at 1651 South State Highway K, Bois D'Arc, Missouri (hereinafter, "the hotel"), three times to secure a room over the phone.  *Id.* at 8-10.  Mr. McCullough informed her that she could not secure a room over the phone, and that someone must appear in person with an ID matching the credit card being used to pay for a room.  *Id.* at 8.  He explained that the hotel required in-person payment for room rentals (except from trucking companies renting rooms for drivers) because it has had problems with people using other people's credit cards.  *Id.*  Thereafter, Defendant came to the hotel lobby to pay for the room held for Nikki and presented his ID and credit card.  *Id.* at 10-11.  During the check-in procedure, Mr. McCullough confirmed that the credit card used by Defendant matched his ID.  *Id.* at 11.  Since Defendant was a local resident, before finalizing Defendant's check-in to the hotel and handing him a key for Room 209, Mr. McCullough advised Defendant of the hotel's strict policy for locals—specifically, that the hotel would not tolerate "any partying, [or] anything illegal."  *Id.* at 11, 13.

After checking in, Defendant and two people entered Room 209.  *Id.* at 12-13.  Between 5:00 and 5:30 a.m., Mr. McCullough was awakened by two people running in the breezeway on the south side of the hotel where Room 209 is located.  *Id.* at 13, 15.  The only other guest on the south side of the hotel was an older gentleman, so Mr. McCullough believed the people running down the breezeway were with Defendant.  *Id.* at 13.

---

[1] The facts set forth are taken from the testimony adduced and the exhibit admitted, without objection, at the hearing on the Motion.  See Transcript (doc. 25) and Exhibit Index (doc. 24).

2

Later that morning, Ms. Harcombe, who cleaned the hotel rooms on Mondays, gave Mr. McCullough a "little spiel of what's going on" and her progress. *Id.* at 15, 95. She alerted him that two rooms (including Room 209) were stayovers (meaning the guests would spend another night), but that there were no vehicles outside the rooms, and that she knocked but there was no answer. *Id.* at 95. She asked Mr. McCullough whether she should "go ahead and go in" to the rooms, to which she said Mr. McCullough responded "yes." *Id.* at 95-96. Accordingly, she briefly entered Room 209. *Id.* at 96-98. In the room, she noticed perfectly made beds, unused towels, untouched shower curtains, one cigarette butt in an ash tray, and the receipt for the hotel next to the ashtray. *Id.* at 96. She advised Mr. McCullough about the unused condition of the room and that she thought "there's something going on." *Id.* at 97. Mr. McCullough testified that he did not recall speaking with Ms. Harcombe, but that after he woke up later that morning (around 11:00 a.m.), he went to clean the south side of the hotel and check on stayovers (including Room 209) because Ms. Harcombe was cleaning the north side of the hotel. (*Id.* at 14-15, 27; Doc. 17 at 2.) He explained that Ms. Harcombe was a new employee at the time, and he preferred to handle stayovers (like Room 209) himself until he built trust with new staff since guests' personal items (i.e., medications, valuables) are in those rooms. (Doc. 25 at 14, 19, 27.)

When Mr. McCullough entered Room 209, he similarly noted that neither the towels nor the shower had been used, observed one used cigarette and a receipt laying on the table, and further noticed that the box spring on one of the two beds had been picked up and moved. *Id.* at 15-16, 29. Since Defendant paid to rent a room for two days, Mr. McCullough looked around for a key "to possibly see if they had checked out early since there was [] nothing visible in the room" but did not find a key. *Id.* at 16. Since no housekeeping was required, Mr. McCullough went to straighten the misaligned bed onto the "prongs that stick up to hold [it] in place" and keep it from

3

moving. *Id.* at 16, 29. In doing so, he noticed a bag "at the very bottom of the box springs . . . less than two or three inches from [his] foot." *Id.* So, he "lifted the frame up," "set it on [his] knee and just pulled the bag out," leaving the bed misaligned. *Id.* at 17, 29. He then "set [the bag] right in front of [the bed] and [] flipped the top open" since it "[j]ust had a flap" and did not require any unfastening. *Id.* at 16-17, 29-30. When asked why he opened the bag, Mr. McCullough explained that locals commonly have extramarital affairs in the hotel and request the same room because they hide play toys under the beds. *Id.* at 17. Since he did not want other guests "to find any of that stuff . . . if [he] find[s] something underneath the box springs, [he] always look[s] at it . . . [because] it's not a place that something should be stored by a guest." *Id.*

Inside the bag, he saw "a freezer bag" with "long pieces" of what he believed to be methamphetamine "packed really full." *Id.* at 17, 30. In his years of experience as a hotel manager, he has previously encountered people who are using methamphetamine and viewed methamphetamine. *Id.* at 12. But "[t]he meth [he] had seen before was kind of more crushed up and smaller. These were really long pieces. So, it took [him] a few seconds to actually figure it out that that's what it was." *Id.* at 17. Once he concluded the bag contained methamphetamine, he left the bag sitting on the floor or up on the bottom of the bed, locked the door behind him, and immediately called 911. *Id.* at 17-18, 30-31. Mr. McCullough stated that once he found methamphetamine in the room, he considered the rental agreement "null and void" and the renters evicted because "once [he] find[s] anything illegal in a room, you've lost your rental."[2] *Id.* at 19, 39, 40.

---

[2] The search warrant application and affidavit, which was granted later the same day at 4:11 p.m., in the Circuit Court of Greene County specifically states: "The manager stated that the policy at the hotel is that if any violation of their rules to include criminal activity occurs, the rental agreement with Hoods Service Center is terminated." (Ex. 1 at 3.)

4

Officers arrived at the hotel within ten to thirteen minutes. *Id.* at 32. Officer Smith was the first to arrive, followed by Officer Whitcomb and Sergeant (Sgt.) Long soon thereafter. *Id.* at 47-49, 68. Upon his arrival, Officer Smith immediately went to the hotel lobby and met with Mr. McCullough, who told him that he saw one of the beds was "off-center" from its base in Room 209, and when "he went to reposition it, looked under it, he saw a brown bag." *Id.* at 48. Officer Smith clarified why Mr. McCullough was in the room, then met with Officer Whitcomb and Sgt. Long, and they went to the south side of the hotel where the room was located. *Id.* at 49. Sgt. Long contacted GCSO drug detectives regarding whether the officers could enter the room and check on what the manager had found. *Id.* at 49. Mr. McCullough met the officers at Room 209. *Id.* at 33, 49.

The officers asked for permission to enter the room, and Mr. McCullough granted "full permission," unlocking and opening the door for their entry. *Id.* at 32-33, 49-50. Officer Smith and Sgt. Long entered first to conduct a safety sweep of the room to confirm no one was in the room. *Id.* at 50-51, 63. As described by Mr. McCullough, the officers observed an "open" brown bag on the floor, at the foot of the first bed between the two beds. *Id.* at 53-54, 59. Inside the bag, Officer Smith saw "the bottom of a magazine end – the magazine of a of a pistol" and "clear plastic bags [that] had some kind of white crystal substance in it" which based on his training and experience was likely methamphetamine. *Id.* at 51-52, 69. Per standard procedure, Sgt. Long made the firearm safe and "removed the firearm [from the bag], emptied the chamber, and the magazine from it." *Id.* at 53-54, 59.

Thereafter, Officer Whitcomb deployed K-9 "Zeke" in the room. *Id.* at 52, 59, 69. K-9 Zeke has received specialized training to alert on narcotics such as cocaine, methamphetamine, and heroin, and Officer Whitcomb and K-9 Zeke regularly perform training and certifications

5

together. *Id.* at 66-67. Officer Whitcomb first deployed K-9 Zeke to search for narcotics at the doorway. *Id.* at 69. K-9 Zeke then sniffed the first bed, before he "came to a [slightly open] canvas bag that was sitting by the foot of the bed in between the two" beds. *Id.* at 69, 71. K-9 Zeke positively alerted to the presence of narcotics, heavily sniffing at the opening of the bag before he laid down and stared at the bag. *Id.* at 69, 74. Officer Whitcomb returned K-9 Zeke to her patrol car, then gathered more information about the people staying in the room from Mr. McCullough and relayed all that information to Sgt. Long and Officer Smith. *Id.* at 70. Sgt. Long informed narcotics detectives that methamphetamine and a firearm were discovered in the room, and officers were standing outside, securing the room so no one would enter. *Id.* at 60, 78.

Within approximately thirty minutes, Detective (Det.) Dibben and Det. Schroeder arrived on the scene. *Id.* at 60. Out of an abundance of caution, based on the officers' information, Det. Dibben prepared an application and affidavit for a search warrant for Room 209, detailing the manager's observations after entry for housekeeping of a bag filled with a white crystalline substance he believed to be methamphetamine, the manager's statement of hotel policy that the rental agreement is terminated "if any violation of rules to include criminal activity occurs," the officers' observations upon entry, and K-9 Zeke's positive alert on the bag. (*Id.* at 78-79, 86; Ex. 1.) He also directed uniformed patrol officers in marked vehicles to park away from the hotel to avoid alerting the renters in case they returned to the hotel. (Doc. 25 at 61, 71, 80.) Within approximately two hours (sometime after 4:11 p.m. when the warrant was signed), Det. Dibben executed the search warrant, entering the hotel room with Det. Schroeder, Agent Atwood, and Agent Rambaud. *Id.* at 80-81, 87. Det. Dibben observed one of the beds "was kind of cockeyed on the frame" and an open beige backpack sitting on the desk to the left. *Id.* at 88. The officers collected the "beige-colored backpack" with "three [gallon-sized] Ziploc bags . . . with white

6

crystal substance that looked like" methamphetamine, a .9mm Smith & Wesson firearm, a cigarette butt, and a receipt from the room, and gave a copy of the search warrant and the inventory to Mr. McCullough. *Id.* at 81. Officers stayed nearby for surveillance in case the renters returned. *Id.* at 81-82, 89.

Mr. McCullough, believing that police had completed their activity and left the property, rekeyed the top deadbolt because "he did not want these people. . . with the key coming back in that room." *Id.* at 18-19, 34-35, 40. About thirty to forty-five minutes after officers withdrew from the room, Agent Atwood saw Defendant and a female approach Room 209, but they were unable to enter because of the changed locks. *Id.* at 40, 82, 89. Defendant remained by the room and the female drove to hotel lobby and told Mr. McCullough that she could not get into the room. *Id.* at 19, 82, 89. Mr. McCullough informed her that a search warrant was provided and that officers could answer her questions, but she appeared to be "very uncomfortable . . .moving around a lot in the lobby and panicking a bit." *Id.* at 19-20. She then quickly drove back to the room, picked up Defendant, and slowly drove across the parking lot to merge onto Highway K. *Id.* at 20, 37-38, 83-84. Before she could turn onto the highway, however, officers stopped the vehicle in the parking lot—Det. Dibben turning on his vehicle's lights directly behind her and Agent Rambaud's vehicle blocking the vehicle's path forward. *Id.* at 83, 90.

Det. Dibben removed the driver, Heather Durbin, from the vehicle and Agent Rambaud and Det. Schroeder removed Defendant from the passenger's seat. *Id.* at 83-84, 91. When Defendant was removed from the vehicle, a cell phone fell onto the ground from his lap or hand. *Id.* at 84. Additionally, the officers discovered a handgun in the passenger seat where Defendant was seated as well as "a bunch of plastic baggies and another bag filled with what was believed to

7

be methamphetamine" underneath the same passenger seat. *Id.* at 84-85. Det. Dibben collected and documented the items as evidence. *Id.* at 85.

  II.   **Conclusions of Law**

Defendant argues for the suppression of all evidence and any statements flowing from the officers' initial warrantless entry and search of his hotel room on March 1, 2021. (Doc. 17 at 1, 7.) Specifically, Defendant contends that he had a reasonable expectation of privacy in his hotel room, and that the search of the room by officers without his consent, including the use of a drug dog, were not justified under any exception to the warrant requirement. (Docs. 17 at 1, 7.) Defendant further argues that any subsequent search warrant obtained, and evidence seized thereto were tainted as the fruit of the officers' illegal entry and search. (Doc. 17 at 7-8.) Similarly, the ensuing traffic stop, search and seizure of evidence from Defendant's person and vehicle, as well as any statements made by Defendant should be suppressed as fruit of the poisonous tree. *Id.* at 10. In response, the Government argues that once the hotel manager found drugs in Defendant's room, Defendant was rightfully evicted such that he no longer had a reasonable expectation of privacy in the room or its contents and possession of the room reverted to hotel management, who consented to the search of the room. (Docs. 20 at 4 and 28 at 1.) The Court takes up the parties' arguments below.

The Fourth Amendment sets forth an individual's right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. The protection against warrantless searches "apply with equal force to a properly rented hotel room during the rental period." *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir. 1986). However, "once a guest has been justifiably expelled, the guest is without standing to contest an officer's entry into his hotel room on Fourth Amendment grounds . . .

8

because, upon eviction, the rental period terminates and control over the hotel room reverts to management." *United States v. Peoples*, 854 F.3d 993, 996 (8th Cir. 2017) (cleaned up); *see also United States v. Molsbarger*, 551 F.3d 809, 811 (8th Cir. 2009) ("Justifiable eviction terminates a hotel occupant's reasonable expectation of privacy in the room.") (citations omitted); *Rambo*, 789 F.2d at 1296 (A guest "cannot assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled").

State statutes govern a hotel's authority to evict guests under certain circumstances. *See Peoples*, 854 F.3d at 996. Under Missouri law, "[a]n owner or operator of a hotel may eject a person from the hotel and notify the appropriate local law enforcement authorities [if he or she] reasonably believes that the individual is using the premises for an unlawful purpose." Mo. Rev. Stat. § 315.075(3); *see e.g., United States v. Bohmont,* 413 Fed. Appx. 946, 950–51 (8th Cir. 2011) (unpublished) (per curiam) (holding Mo. Rev. Stat. § 315.075 justified officers' entry to hotel room because registered guest was evicted and no longer had a reasonable expectation of privacy).

### a. Defendant was Justifiably Evicted once Mr. McCullough discovered the Methamphetamine

Defendant contends that there are only "two constitutionally acceptable justifications for the warrantless search and entry" of his hotel room by officers: (1) he had been ejected or evicted from the room; or (2) the officers' entry was at the request of the hotel for the purpose of ejecting or evicting Defendant—and he contends that neither is applicable here. (Doc. 29 at 5, 8.) As to the first possible justification, Defendant maintains that he was not evicted and thus, retained a reasonable expectation of privacy in the room (and the bag) until Mr. McCullough changed the locks to the room, because notice of the eviction, or "further action" by the hotel was required "to divest [Defendant] of his statute as an occupant." *Id.* at 5-8.

Contrary to Defendant's arguments, the undersigned concludes that Defendant was evicted from his hotel room at the point in time when Mr. McCullough discovered the methamphetamine and reasonably believed that Defendant was using the premises for an unlawful purpose; and therefore, upon such discovery, Mr. McCullough had the discretion and authority to evict Defendant and notify law enforcement about what was found. *See* Mo. Rev. Stat. § 315.075(3). Section 315.075(3) authorizes a hotel operator to "eject a person from the hotel and notify the appropriate local law enforcement authorities [if he] reasonably believes that the individual is using the premises for an unlawful purpose." When interpreting a state statute, the Court applies the state's rules of statutory construction. *In re Dittmaier*, 806 F.3d 987, 989 (8th Cir. 2015). Under Missouri law, the primary object of statutory construction "is to ascertain the intent of the legislature from the language used and to consider the words used in their plain and ordinary meaning." *Id.* Only when the language of the statute is ambiguous or would lead to an absurd or illogical result, should the Court look beyond the plain and ordinary meaning of statute. *Kersting v. Replogle*, 492 S.W.3d 600, 602 (Mo. Ct. App. 2016).

The statutory language at issue here is clear and further interpretation is unnecessary. Mr. McCullough, the hotel operator here, reasonably believed that Defendant was using the room for an unlawful purpose, having found a bag "packed really full" of what he reasonably believed was methamphetamine. Accordingly, per his discretion, he ejected Defendant, terminated the rental agreement, and notified law enforcement of the illegal contraband found. This conclusion is supported by Mr. McCullough's testimony that (1) he advised Defendant during check-in of the hotel's strict policy for locals that the hotel would not tolerate any illegal activity; (2) he considered Defendant's rental agreement terminated and the occupants evicted once he found anything illegal

10

in the room; and (3) he later changed the locks to the room to ensure Defendant would not enter the room.

Defendant argues that he maintained a reasonable expectation of privacy in the room, relying heavily on *Stoner v. California*. 376 U.S. 483, 489–90 (1964). The facts there are inapposite to the case at bar. In *Stoner*, the hotel clerk consented to the search of a guest's room solely based on the officers' representations that the absent guest was possibly involved in a robbery and had a weapon. *See id.* at 485, 489 Conversely here, Mr. McCullough discovered the bag of methamphetamine himself, without any officer involvement, while performing his housekeeping duties in Defendant's room, and thereafter evicted Defendant and notified the police of the discovery of methamphetamine. *See id.* at 489 ("[W]hen a person engages a hotel room he undoubtedly gives implied or express permission to such persons as maids, janitors or repairmen to enter his room in the performance of their duties.") (cleaned up).

Additionally, Defendant's argument that he was not evicted until notice of the eviction, or "further action" was taken by the hotel, that is, when Mr. McCullough changed the locks to the room, is not supported by statute. The relevant statutory language does not require "notice" or any other action to evict a hotel guest, and the undersigned deems the omission of such language in the statute to be intentional and indicative of legislative intent. (Docs. 21 at 2 and 29 at 5-6, 8.) *See State v. Beck*, 581 S.W.3d 97, 102 (Mo. Ct. App. 2019)). ("A court may not add words by implication to a statute that is clear and unambiguous."); *see also Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) ("It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts.") (cleaned up); *cf. Young v. Harrison,* 284 F.3d 863, 870 (8th Cir. 2002) ("[A] hotel guest is not a tenant and adherence to the eviction statute is not required to expel an unruly guest from a hotel."); *Jantz v.*

11

*Brewer,* 30 S.W.3d 915, 918 (Mo. Ct. App.2000) ("[T]he legislature is presumed ... to act intentionally when it includes language in one section of a statute but omits it from another."). Notably, in statutes governing landlord-tenant relationships in Missouri, the legislature includes unambiguous notice requirements, as opposed to the statute at issue wherein no notice requirement was included. *Compare* Mo. Rev. Stat. § 441.060 (requiring written notice to terminate a tenancy at will) *with* Mo. Rev. Stat. § 315.075 (omitting any notice requirement to eject a hotel guest). The authority of a hotel owner or operator to eject a guest without notice (even in his or her absence) is appropriate, given that a room is typically rented for a short duration and withholding the authority to eject a person from hotel management without "further action" could led to absurd results, e.g., inability to eject an absent guest despite discovery of severe damage to hotel property or dangerous criminal activity placing staff and other guests at risk of harm. *See Peoples,* 854 F.3d at 997 ("In Missouri, section 315.075 expressly provides for evictions based on a reasonable belief of illicit activity. The statute does not require emergency or exigent circumstances for such an eviction, and we decline to impose this condition where the state legislature chose not to do so."). Accordingly, the undersigned finds that Defendant was evicted upon the manager's discovery of methamphetamine in the room, a clearly unlawful purpose; and no further action was required to divest Defendant of his status as an occupant.

  As to the second possible justification for the warrantless search and entry, Defendant states that the officers' entry to the room was not to eject or evict Defendant (considering he was absent from the room), and rather, was to conduct a search based on Mr. McCullough's statements. *Id.* at 8-9. Defendant highlights that the majority of Eighth Circuit precedent involve cases where officers' entry to a hotel room is at management's request for purpose of ejecting a guest or unregistered occupants from the premises, not to conduct a search, whereas here, Defendant was

absent, and officers entered to conduct a search. (Docs. 21 at 3-5 and 29 at 8.) *See Peoples*, 854 F.3d at 996 (officers provided room key by hotel clerk to evict occupants); *Molsbarger* 551 F.3d at 810 (officers entered room to evict hotel guests who were having a loud party when they discovered the defendant with multiple arrest warrants in the room); *Rambo,* 789 F.2d at 1292 (officers entered to evict a guest after receiving complaints of a naked man running through the hotel); *Bohmont,* 413 Fed. Appx. at 949 (officers entered room to remove trespassing occupants since registered guest was under arrest). While those cases involve instances where guests or unregistered guests were present and evicted by officers at hotel management's request, they do not limit a hotel owner or operator's authority under the statute to evict guests solely to those circumstances. *See* Mo. Rev. Stat. § 315.075(3); *Peoples*, 854 F.3d at 997 ("[J]ust because we have held that disruptive, unauthorized conduct in a hotel room invites intervention from management and termination of the rental agreement, it does not logically follow that there are not other circumstances in which the control over a room reverts to hotel management.") (cleaned up); *see e.g., United States v. Summe*, 182 Fed. Appx. 612, 614 (8th Cir. 2006) (unpublished) (holding that the search of the defendant's hotel room and luggage for guns and contraband was reasonable; that the defendant lacked "standing to contest the officer's entry (search) into the room"; and that "any legitimate expectation of privacy . . . in the bag was outweighed by the officer's concern for their safety"). Here, the discovery of a bag of methamphetamine by the hotel manager supporting the belief that the premises were being used for an unlawful purpose presents another circumstance where control of the room validly reverts to hotel management. Accordingly, Defendant was "evicted" upon such discovery by Mr. McCullough and control over the hotel room reverted to management prior to officers' arrival to the hotel.

13

### b. The Officers' Entry Based on Mr. McCullough's Consent was Proper

The next issue is whether Mr. McCullough's consent to search the room was proper, justifying the officers' initial warrantless entry and search of the room. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ("It is [] well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). "Consensual searches do not violate the Fourth Amendment because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008) (cleaned up). For "a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *Id.*

Defendant contends Mr. McCullough acted as an agent of the Government when he opened the door to the room at the officers' direction. (Doc. 29 at 6.) However, upon a thorough review of the facts in this case, the undersigned disagrees, finding that Mr. McCullough validly consented to the officers' entry and search of the room, possessing actual authority to consent.

As a preliminary matter, the undersigned notes that when Mr. McCullough entered Room 209 and discovered what he believed to be methamphetamine, he was performing housekeeping in the regular course of his duties, having implied, if not, express, permission from Defendant to do so, and was not acting as an agent of the Government. *See United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004) ("A search by a private citizen is not subject to the strictures of the Fourth Amendment unless that private citizen is acting as a government agent.") (citation omitted). Courts have consistently held that persons such as maids and housekeeping staff have implied or, perhaps even express, permission from the occupant to enter a hotel room without a warrant in the performance of their duties. *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011);

*see Stoner*, 376 U.S. at 489 ("when a person engages a hotel room he undoubtedly gives 'implied or express permission' to 'such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties.'"). Therefore, when Mr. McCullough evicted Defendant based on the discovery of what he believed to be methamphetamine, he was not acting as an agent of the Government and his private actions do not run afoul of Fourth Amendment protections.

Thereafter, since Defendant was evicted, control of the room reverted to Mr. McCullough as the hotel manager, and he had both actual (and apparent) authority to consent to the officers' entry to the room. In fact, Mr. McCullough specifically testified that when officers requested permission to enter the room, he granted "full permission," unlocking and then opening the door for the officers' entry, which demonstrates his consent to the officers' entry. *See also United States. v. Faler*, 832 F.3d 849, 853 (8th Cir. 2016) ("Voluntary consent may be express or implied. In determining whether [a party] gave implied consent, "the precise question is not whether [he] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented."); *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) ("[C]onsent may be inferred from words, gestures, or other conduct.") (cleaned up). A reasonable person would interpret Mr. McCullough's affirmative act of unlocking and opening the door at the officers' request for permission to enter as consent, especially considering Mr. McCullough called the police to the hotel *because* he found illegal contraband and had evicted Defendant. Having been evicted, Defendant lacks standing to contest the officers' entry (and search) of the room with the hotel management's permission on Fourth Amendment grounds. *See Peoples*, 854 F.3d at 996; *Rambo,* 789 F.2d at 1295–96; *United States v. Allen,* 106 F.3d 695, 699 (6th Cir.1997).

### c. The Search of the Bag was Proper

Defendant argues that Defendant maintained a privacy interest in the bag, and the search of the bag by law enforcement exceeded the scope of the search by Mr. McCullough. (Doc. 29 at 9-10.) The undersigned is unpersuaded.

As noted earlier, the initial search of the bag and discovery of what was believed to be methamphetamine (as well as Defendant's eviction) was by a private actor and does not run afoul of Fourth Amendment protections. U.S. Const. amend IV; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005). And, Defendant does not have standing to contest the search of the room nor the contents therein, as any expectation of privacy Defendant may have had ceased when he was evicted from the hotel. *Molsbarger*, 551 F.3d at 811; *accord Rambo,* 789 F.2d at 1295-96; *see also United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) ("[W]hen a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any articles therein of which the hotel lawfully takes possession.") (citations omitted).

Nevertheless, to the extent Defendant may have maintained any legitimate privacy interest in the bag, the undersigned finds that the officers had the right to be in the room where the bag was found based on valid consent and the methamphetamine and the bottom of a firearm were plainly visible from the "open" or "partially open" bag. *See Allen,* 106 F.3d at 699 (finding "the manager's consent to officers' search of the room was all that was required to avoid constitutional infirmity" given the occupant was evicted and were drugs in plain view inside room). The plain view doctrine requires that (1) the officers did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself. *United*

16

Case 6:21-cr-03070-BP     Document 31     Filed 11/10/21     Page 16 of 19

*States v Hughes*, 940 F.2d 1125, 1126–27 (8th Cir. 1991); *United States v. Turbyfill,* 525 F.2d 57, 59 (8th Cir.1975) (holding police may lawfully seize evidence in plain view where police are lawfully in the position from which contraband was seen).

Here, the bag was initially concealed under the bed frame, but private action caused the bag, and its contents, to be visible. Next, the officers testified that the first step of their entry was to conduct a protective sweep to ensure that no one was in the room. *See e.g. United States v. Jones*, 586 F.3d 573, 575 (8th Cir. 2009) ("The officers lawfully conducted a protective sweep of the garage and seized the marijuana which was visible in the open duffel bag.). Additionally, the container at issue was not a "locked" container or suitcase that the officers forcefully opened, but rather a bag with a flap that was already "open" or at least "partially open" such that its contents were visible.

Per a plain view analysis, the undersigned finds that the officers' initial entry to the hotel room did not violate the Fourth Amendment given their entry based on the manger's consent. Second, the incriminatory nature of the firearm and methamphetamine was immediately apparent. Officer Smith quickly identified the "white substance" as methamphetamine based on his training and experience upon viewing it in the open bag. This was further confirmed by K-9 Zeke's positive alert on the bag. Lastly, the open bag was observed in a place (on the floor between the two beds) where the officers had the right to be given the manager's consent.

Defendant next briefly argues that the officers exceeded the scope of the manager's search because the dog sniff and discovery of the firearm suggests the officers' search was more intrusive than the manager's search. This argument is also unpersuasive.

Here, the undersigned has already held that the methamphetamine and the firearm were plainly visible. But, in any case, Mr. McCullough testified that he opened the bag, looked inside,

identified what he believed to be methamphetamine, left the bag in the room, and proceeded to call the police. It is likely Mr. McCullough's handling or manipulation of the bag may have caused items in the bag to shift such that the bottom of the pistol became visible before officers viewed the bag on the floor. Therefore, for the safety of officers and the public at large, making the firearm safe was a reasonable course of action under the circumstances and consistent with standard procedure. *See Summe*, 182 Fed. Appx. at 615 ("Given the substantial public concern for the safety of police officers lawfully carrying out enforcement efforts, we cannot say the officers acted unreasonably in making sure the bags did not contain weapons before turning them over to [the defendant], a previously convicted felon."). Additionally, the dog sniff was also reasonable because it was conducted after Mr. McCullough consented to the officers' entry and thus, in a place where Officer Whitcomb and K-9 Zeke had a right to be.

### a. Fruit of the Poisonous Tree

Because the search of the room was premised on the valid consent of Mr. McCullough, the evidence obtained as a result need not be suppressed as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963) (explaining that under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality). Here, there was no illegal police conduct at issue because, as discussed, the search of hotel room was permissible based on Mr. McCullough's consent, who had the actual authority to grant such consent; and further, having been evicted, Defendant has no standing to contest the search as he had no reasonable expectation of privacy in the room. Accordingly, any evidence derived as a result of the initial warrantless entry to the room, including the warrant secured, as well as the subsequent search of Defendant's person and

vehicle at the ensuing stop, and any incriminating statements or admissions made by Defendant, need not be suppressed as fruits of the poisonous tree.

### III. Recommendation

Based on all the foregoing, and pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1 of the United States District Court for the Western District of Missouri, the undersigned hereby **RECOMMENDS** that the Motion to Suppress Evidence (doc. 17) be **DENIED.**

/s/ David P. Rush
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: November 10, 2021